UNITED STATES of America, ex rel. Jack Obeydean SWAFFORD, a/k/a Dean J. Swafford, Plaintiffs,

v.

BORGESS MEDICAL CENTER, a nonprofit Michigan corporation, Bronson Methodist Hospital, a nonprofit corporation, Advanced Vascular Surgery, P.C., a Michigan professional corporation, Krishna Jain, M.D., John Munn, M.D., Eugene Simoni, M.D., John T. Collins, Jr., M.D., and Randy Smejkal, M.D., James McLaren, M.D., Healthcare Midwest General & Vascular Surgeons, a/k/a Healthcare Midwest, P.C., a Michigan corporation, Mark Tagett, M.D., Philip Borozan, M.D., Solomon K. Samuels, M.D., P.C., a Michigan corporation, Solomon K. Samuels, M.D., Padraic Carmody, M.D., Karim Abedel Abushmaies, M.D., and M. Abidur Rahman, M.D., jointly and severally, Defendants.

No. 4:97–CV–116.

United States District Court, W.D. Michigan, Southern Division.

Feb. 18, 2000.

Michael A. Gagleard, Ishbia & Gagleard, PC, Birmingham, MI, for Plaintiffs.

James Robert Bruinsma, Dykema Gossett PLLC, Grand Rapids, MI, Seth M. Lloyd, Dykema Gossett, PLLC, Detroit, MI, Howard E. O'Leary, Dykema Gossett, PLLC, Washington, DC, Elizabeth J. Fossel, Varnum, Riddering, Schmidt & Howlett LLP, Grand Rapids, MI, Jeffrey D. Smith, Varnum, Riddering, Schmidt & Howlett, Kalamazoo, MI, Scott R. Sikkenga, David A. French, Miller, Canfield, Paddock & Stone, Ann Arbor, MI, for Defendants.

## OPINION GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

McKEAGUE, District Judge.

Now before the Court are defendants' motions for summary judgment, filed September 29 and October 13, 1999.[1] The Court held a hearing on the motion on November 29, 1999, and at that time took the matter under advisement. After having carefully considered the parties' arguments, both as made in their briefs and at the hearing, the Court will grant defendants' motions for summary judgment under Fed.R.Civ.P. 56(c) for the reasons set forth below.

### I

Plaintiff is a registered vascular technologist employed by defendant John T. Collins, Jr., M.D., Randy Smejkal, M.D., and James McLaren, M.D., P.C., since December 1997 and at the time of the filing of the parties' original summary judgment motions in October 1998. From 1992 until 1997, plaintiff was lead technologist at defendant Borgess Medical Center's vascular ultrasound department, and was also employed as a vascular technician at Bronson Methodist Hospital from 1988 to 1989. Accordingly, plaintiff participated in delivery of venous ultrasound studies ordered by defendant physicians and observed defendants' practices regarding the submission of Medicare/Medicaid reimbursement forms for ultrasounds performed on defendant physicians' patients.

For patients suspected suffered from risk factors for deep vein thrombosis ("DVT" or "blood clot"), defendant physicians would order a venous ultrasound study either at defendant hospital or at the offices of defendant clinics. Using ultrasound, the patient's venous system would be examined to determine the presence or absence of certain "normal" characteristics for five DVT risk factors.[2] The ultrasound study would typically be performed by either a technician or a technologist, who would then indicate the presence or absence of the five factors on a worksheet, which was then given to the physician for review. Because the technologist would summarize data for the physician, strict

---

[1] The physicians' motion for summary judgment was filed September 29, 1999. Defendants Healthcare Midwest, P.C., Mark Tagett, M.D., and Philip Borozan, M.D. filed a separate motion for summary judgment on September 29, 1999. Defendant Borgess Medical Center filed its motion for summary judgment on October 13, 1999. Because defendant hospitals' and defendant physicians' arguments raise substantially identical legal issues, and because defendant hospitals' liability is contingent upon a finding of liability against defendant physicians, the Court will treat the separate motions collectively.

[2] The five factors are (1) "phasisity" (flow velocity changes in response to quiet respiration); (2) "augmentation" (an abrupt increase in venous flow result from manual compression of the extremity distal to the site of examination); (3) "spontaneity" (the presence of normal flow); (4) "compression" (the ability to fully compress the vein with a small amount of extrinsic pressure); and (5) "competence" (the abrupt cessation of blood flow in large and medium-sized veins). (Pl. Br. at 4).

protocols were developed by defendant hospitals' vascular panels to ensure accuracy and reliability. The technician/technologist was assigned to determine either the presence or absence of the characteristics, and to indicate either "positive" or "negative" for each factor.

Having performed the test itself, the technician/technologist was not required to grade the results or evaluate the results in comparison to a normative scale, tasks reserved to the physician in each instance. Defendant physicians would review the technician/technologists' worksheet, and then prepare a final report setting forth their findings and conclusions. . Finally, defendant physicians signed the following statement prior to submitting the results for reimbursement: "I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction."

The federal government's Health Care Financing Administration ("HCFA") administers the Medicare program in part through private contractors.[3] These contractors, or "carriers," serve as fiscal intermediaries for claims submitted by physicians or hospitals for reimbursement from Medicare. For their patients who are covered by Medicare, physicians may submit bills to the carrier for reimbursement of the professional component of venous ultrasound studies. HCFA publishes a Carriers Manual, which provides carriers with guidelines for reimbursement of claims. To aid providers, including physicians, HCFA provides interpretive guidelines for submitting claims that are summarized in a Provider Handbook. HCFA also publishes all the above guidelines in the Federal Register.

A doctor who provides services to a Medicare or Medicaid recipient submits a claim for reimbursement to a Medicare carrier on a form known as the "HCFA 1500." The HCFA 1500 lists those services provided to a single patient and requires the doctor to provide his identification number, the patient's information, and a five-digit global billing code identifying the services for which reimbursement is sought.

The American Medical Association established these five-digit billing codes for use by physicians or other health care providers when submitting bills to their carrier for reimbursement. With respect to venous doppler studies at issue, defendant physicians used the following global billing codes: 93965, indicating non-invasive venous studies of an extremity; 93970, indicating a duplex scan of extremity veins or a complete bilateral study; and 93971, indicating a unilateral or limited study. For the significant majority of the claims at issue, defendant physicians billed the government under codes 93970 and 93971, with a "26 modifier." The 26 modifier indicates that the physician delivered solely the "professional," as distinct from the "technical" component of the test, and did not perform an integrated, or "global," service. Accordingly, when physicians submit claims for services billed with a 26 modifier, they are compensated at a lesser rate for having provided only the professional portion of the test.

Plaintiff filed his complaint on September 3, 1997, as a *qui tam*[4] action under the

---

3. The Medicare program is administered by the Health Care Finance Administration, part of the Department of Health and Human Services. The program is authorized by Title VIII of the Social Security Act, and is divided into two parts. Part A of the Medicare program deals primarily with the reimbursement of hospitals for costs that they incur treating patients covered by Medicare, while Part B generally deals with the reimbursement of providers for physicians' services.

4. " 'Qui tam' is an abbreviation for the Latin phrase 'qui tam pro domino rege quam pro si ipso in hac parte sequitur,' meaning 'Who sues on behalf of the King as well as himself.' " *United States v. Horizon Healthcare Corp.,* 160 F.3d 326, 329 n. 1 (6th Cir.1998)(quoting *Black's Law Dictionary* 1251 (6th ed.1990)).

False Claims Act, 31 U.S.C. § 3729, on behalf of the federal government. After having undertaken a review of the suit within the sixty-day statutory period, the United States notified the Court that pursuant to 31 U.S.C. § 3730b(4)(B), it declined to intervene. Accordingly, throughout this opinion the Court employs the appellation "plaintiff," as opposed to "relator," because plaintiff elected to maintain the instant action on his own accord after the government declined to aid in the prosecution of the suit.[5] On February 1, 1999, the Court dismissed the two common law claims included in plaintiff's complaint, leaving the claim under the False Claims Act ("FCA") as the sole remaining theory against defendants.

The gravamen of plaintiff's complaint alleges the various defendants defrauded the government by falsely charging for services they did not provide. Specifically, plaintiff alleges defendant physicians did not review any hard copy data (video tape results) generated by venous ultrasound studies taken of patients suspected of suffering from DVT, where the vascular technologist or technician reported the ultrasound results as either negative or negative with abnormality. Instead, plaintiff contends the physicians merely reworded and/or plagiarized the technician's or technologist's "worksheet" to prepare a physician's ultrasound report. Defendant physicians then billed the government through Champus, Medicare or Medicaid for these "interpretations" which, according to plaintiff, constituted mere plagiarism of the worksheet prepared by the technician/technologist.

Plaintiff further alleges defendant Borgess Medical Center was aware of this fraudulent physician practice, pressured plaintiff to keep his complaints "in-house,"

and functioned as a co-conspirator with the physicians through its vascular panel.

## II

A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact." Fed. R.Civ.P. 56(c). See Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Southeastern Oakland County Resource Recovery Auth. v. Madison Heights, 5 F.3d 166 (6th Cir. 1993). "When the moving party has carried its burden under rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It must establish that there is a "genuine issue for trial." Id. at 587, 106 S.Ct. 1348. The inquiry under a motion for summary judgment is thus the same as that under a motion for judgment as a matter of law: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–2, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III

The Court begins by reviewing the relevant sections of the False Claims Act, which provide liability for:

(a) [ . . . ] Any person who—

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval . . . ; [or]

(2) knowingly makes, uses, or causes to be made or used, a false record or state-

5. For purposes of this opinion, the Court assumes the constitutionality of a plaintiff proceeding under the False Claims Act even though the government has declined to join the suit as a party. The Court notes, however, that this very question is currently before the Supreme Court in *United States of America Ex Rel. Jonathan Stevens v. State of Vermont Agency of Natural Resources*, 162 F.3d 195, cert. granted, —— U.S. ——, 119 S.Ct. 2391, 144 L.Ed.2d 792 (1999).

ment to get a false or fraudulent claim paid or approved by the Government ... is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .

§ 31 U.S.C. 3729(a)(1),(2). Hence, to prevail under § 3729(a), a plaintiff must establish at least three elements [6]: first, that the defendant knowingly presented or caused to be presented a claim to the United States for payment or approval; second, that the claim was false or fraudulent; and third, that the defendant knew the claim was false or fraudulent.

### A.

The parties do not dispute that defendants presented "claims" as defined under the FCA by submitting HCFA 1500 forms seeking reimbursement from Medicare. Accordingly, the Court commences its analysis with the second element of the cause of action, to determine if a genuine issue of material fact exists as to whether defendants submitted claims that were false. Defendants deny that any false or fraudulent claims, and assert they personally provided the professional component of all venous ultrasounds for which they sought reimbursement. Plaintiff disagrees, arguing defendant physicians failed to receive sufficient information to make a properly billable "interpretation" according to HCFA's Carriers Manual.

As a threshold question, the Court determines what law or administrative regulation governs provider services rendered in connection with venous ultrasound studies. Defendants argue HCFA's Provider Handbook, which sets forth general billing guidelines for physician services, contains no instructions specific to venous ultrasounds. Defendants further argue plaintiff's proposed authorities, including HCFA's Carriers Manual, constitute neither controlling law nor appropriate guidelines for physicians. According to defendants, the Carriers Manual dictates whether financial intermediaries should pay claims, and is not intended to guide the physician's decision to submit a claim for reimbursement. Hence, defendants assert the truth or falsity of the claims at issue should be evaluated in light of the guidelines for reimbursement of the professional component of tests set forth in the Provider Handbook and the general certification in the HCFA 1500 that all services were "medically indicated and necessary for the health of the patient" and were furnished personally or under their supervision.

In response, plaintiff acknowledges Medicare has not specifically promulgated regulations governing a physician's interpretation of venous ultrasound studies. (Pl. Orig. Br. at 1 n.4; Dkt. No. 60). Nevertheless, plaintiff contends the Medicare Carriers Manual, published by HCFA and published at 42 C.F.R. § 415, impliedly governs the delivery of venous ultrasound services, and offers the affidavit of a past President of the Society of Vascular Technology to that effect. (Pl. Br. at 21; Ex. 17). Alternatively, plaintiff argues the Court should evaluate the representations made in defendant's HCFA 1500 forms in light of other HCFA regulations for billing of radiology services, x-rays and other procedures performed by residents and attending physicians. (Pl. Br. at 21–23). Although plaintiff fails to explain which of these regulations should be viewed as controlling, he nonetheless argues the failure to comply with some or all of these regula-

---

**6.** There is a split of authority as to whether a relator is required to establish that the Government has suffered damages as a result of the false claim or claims at issue. The Second Circuit affirmed an opinion holding damages constitute a necessary element under the FCA. *See Blusal Meats, Inc. v. United States,* 638 F.Supp. 824, 827 (S.D.N.Y.1986), *aff'd,* 817 F.2d 1007 (2nd Cir.1987), but did not address that particular issue in the appeal. Other courts, however, have found proof of damages to be unnecessary. *See, e.g., United States v. Kensington Hosp.,* 760 F.Supp. 1120, 1127 (E.D.Pa.1991).

tions equates to the submission of a false claim.

 Given the lack of specific billing regulations concerning venous ultrasounds, the Court is not persuaded by plaintiff's arguments. As a matter of law, the Court concludes plaintiff's position on this issue is insufficient to establish a genuine issue of material fact. Plaintiff concedes HCFA has not promulgated specific regulations relating to the submission of reimbursement claims for venous ultrasounds, but proposes the Court instead employ HCFA Carriers Manual regulations on radiology as governing venous ultrasounds. The case law makes clear, however, that the Carriers Manual is merely a guide for fiscal intermediaries between Medicare and physicians, and lacks "the binding effect of law or regulation." *National Medical Enterprises v. Bowen*, 851 F.2d 291, 293 (9th Cir.1988). Moreover, the Carriers Manual is intended to instruct carriers as to whether to pay a claim and is not routinely provided to physicians. Indeed, by its terms the Carriers Manual does not purport to address the physician's decision to submit a claim for reimbursement, and most importantly, does not dictate whether physicians are required to review the hard copy data of venous ultrasounds. Hence, the Court declines to judge the truth or falsity of defendants' representations in light of the Carriers Manual.

 In like fashion, the Court fails to find the alternative regulations proposed by plaintiff to be controlling.[7] Plaintiff has neither established that compliance with these standards is a prerequisite for reimbursement by Medicare for venous ultrasounds, nor adduced any facts to support an inference that the physicians knew or believed these regulations to be applicable to their submissions. Even if these regulations were to be held applicable, the

"FCA is not an appropriate vehicle for policing technical compliance with administrative regulations." *U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1020 (7th Cir.1999). Mere violations of administrative regulations are not actionable under the FCA "unless the violator knowingly lies to the government about them." *Id.* Accordingly, the Court declines to apply these regulations to the determination of whether defendant physicians submitted false claims, and thereby unjustifiedly broaden the scope of liability under the FCA. *Accord U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1265 (9th Cir.1996).

### B.

Plaintiff nevertheless proceeds to argue that defendant physicians' claims are false even when viewed in light of the general regulations governing reimbursement for physician services set forth in the Provider Handbook.[8] At the heart of this issue lies the Provider Handbook's definition of services, which divides delivery of medical tests into two components, professional and technical. The professional component of physician delivered services is described as:

> the interpretation or reading of the results of the test performed. The professional component of a service should be billed showing the location of a patient at the time that the service was rendered. If a code showing "interpretation and report only" is not available, use the global procedure code with modifier 26.

By contrast, the technical component is described as:

> the actual performance of the test. It does not require the expertise of a physician. Normally, the office staff or hospital staff performs the technical portion

---

7. In addition to the Carriers Manual, plaintiff cites the Court to regulations including 60 C.F.R. § 63142; 42 C.F.R. §§ 415.102, 415.120, 415.130, 1395; and 60 C.F.R. §§ 63130–63133.

8. Plaintiff concedes, that, "at worst," the regulations governing physicians' services in the Provider Handbook are applicable to venous ultrasounds. (Pl. Br. at 9).

of the test. If a "tracing only, without interpretation and report" is unavailable, use the global procedure code with modifier TC.

Medicare Part B Provider Handbook for Michigan, I-27 (March 1997).

The parties agree that a vascular technician/technologist would first perform ultrasounds on the patient, and then reduce the hard data results (videotape) to a worksheet, tasks comprising the technical component of service delivery. The worksheet calls for the technician to indicate the presence or absence of five risk factors for DVT. Here, however, the parties' contentions diverge. Defendants contend the "results of the test" encompass the technician's/technologist's worksheet, which presents objective results for five factors of the test. According to plaintiff, only the videotape, photograph or other hard copy data qualify as the "results of the test." By failing to review the underlying data in each instance, plaintiff submits defendant physicians failed to "interpret or read" the "results of the test" as required by the Provider Handbook's requirement for professional services.

Noting that no regulation requires the review of such data, defendant physicians respond that the review of hard copy data is not required by the Provider Handbook's general requirements for professional services. Rather, defendant physicians claim they performed an "interpretation or reading" of the objective data provided by the technician/technologist, and then visualized, or formed a mental picture of, the patient's venous condition with regard to DVT. (Def. Br. at 11 n.7). Defendant physicians assert this procedure comports with the certification they made on the HCFA 1500 form that all services sought to be reimbursed were, "medically indicated and necessary for the health of the patient and were personally furnished" by them and squares with their practice of billing for the professional component the ultrasound test with a 26 modifier.

To plaintiff, this argument demonstrates the "absurdity and desperation of defendants' position," in that the "physician's IMAGINATION of what the patient's veins MUST HAVE looked like on the ultrasound" cannot justifiably qualify as a justifiably billable "physician service." (Pl. Br. at 3). Compounding the alleged fraud, plaintiff contends defendant physicians then would then merely adopt, reword, or plagiarized the technician's worksheet. Because plaintiff alleges defendant physicians were not normally present during the administration of the ultrasound, he contends they lacked any first-hand knowledge of the testing. Hence, plaintiff frames the issue as whether defendant physicians were provided with sufficient information to make a "properly billable interpretation" under the Provider Handbook, raising two theories of falsity: implied false certification and actual falsehood.

## C.

■ Plaintiff's argument concerning the adequacy of defendant physicians' interpretation first takes form as an argument for implied false certification. Contending defendants' practice amounts to "inadequate and pathetic patient care," plaintiff avers defendant physicians' procedure falls short of the standard of care by (1) failing to review the underlying data of the ultrasound studies—the photographs, prints or videotape of the ultrasounds taken by the technologist/technician; (2) assuming the accuracy of the worksheet information provided by the technician/technologist, a number of whom lack working knowledge of physics; and by (3) failing to perform an independent review of either the hard-copy data, thus increasing the risk of unnoticed interpretative error. (Pl. Br. at 13).

According to plaintiff's affidavit, defendant physicians would merely copy or reword the worksheet prepared by a technologist or technician where the ultrasound indicated the five factors were either negative for DVT or negative with abnormal

indications. (Pl. Br. at 7; Pl.Ex. 18). Plaintiff further testifies defendant physicians would assume the normalcy of the five factors tested by the ultrasound technician, and thus fail to provide any independent service. For support, plaintiff adduces the affidavits of a board certified vascular surgeon [9] and that of a director of clinical R & D at a corporation located in Seattle, WA,[10] both disagreeing with the defendants' practice. (Pl. Br. at 9, n. 17; Pl.Ex. 22; 17). By submitting claims for reimbursement that represent sub-standard care, plaintiff argues defendants impliedly presented false claims under the FCA.

Assuming for purposes of this motion that the standard of care attendant to venous ultrasound studies is accurately characterized by plaintiff and by his expert witness,[11] the Court nevertheless concludes that as a matter of law, plaintiff cannot demonstrate the falsity of defendants' claims under the FCA by proving their delivery of services fell short of the requisite standard of care. Although the Sixth Circuit has not spoken directly to this issue, the Seventh Circuit rejected a similar argument when it was presented upon similar facts in *Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730 (7th Cir.1999).

*Luckey* presented the question of whether the defendant was required to follow an arguably more effective and more expensive method for testing blood plasma samples. Federal regulations required the defendant to test incoming plasma units for hepatitis and human immunodeficiency virus ("HIV") before commingling the units. Baxter's normal procedure was to perform a color inspection test on every unit, but a total protein test only on those units that failed the color inspection test. Alleging Baxter should have performed the total protein test on each plasma unit to detect possible saline dilution (a situation which might render false negative tests results for HIV), the plaintiff, a former laboratory technician for the defendant, filed suit under the FCA. She argued that despite her warnings, management continued to employ the total protein test only after batches failed the color inspection test, thus creating an increased risk that saline contamination would go unnoticed. According to the plaintiff's reasoning, each time Baxter presented a claim to the Government for payment, it impliedly certified its compliance with applicable regulations. Hence, the relator reasoned that because Baxter failed to employ the more accurate

**9.** The Court notes that the curriculum vitae of plaintiff's expert, Richard Schwartz, M.D., indicates his most recent position in vascular surgery ended nearly 15 years ago in December 1985. Accordingly, although Dr. Schwartz claims in his affidavit to have been interpreting and billing for venous ultrasound studies "over the years, inclusive of 1991 to date," it is unclear from his credentials that Dr. Schwartz possesses familiarity with the present practice of venous ultrasound interpretation.

**10.** The curriculum vitae of this affiant indicates he is not a physician, but a vascular technologist with a nursing degree. His opinions often amount to mere legal conclusions, and, most significantly, he lacks qualification to testify as to the process a physician undertakes to perform an interpretation of a venous ultrasound study.

**11.** Plaintiff argued at the hearing on this motion that a nationwide standard of care should apply to the interpretation of venous ultrasound studies, yet offers no evidence that interpretation of venous ultrasounds amounts to a medical specialty. For purposes of this motion, however, the Court assumes the rectitude of Dr. Schwartz's characterization of the standard of care, while noting that in his affidavit, Dr. Schwarz does not claim to (1) have observed the standard of care in the relevant medical community of either the State of Michigan or Kalamazoo, Michigan, where defendant physicians practiced; (2) have himself observed the standard of care (by viewing hard copy data in each instance) in his own practice in Toledo, OH and Seattle, WA; or (3) have witnessed the physicians with whom he practiced viewing hard copy data as a matter of course when performing interpretations of venous ultrasound studies where the technician/technologist reported the results as negative or negative with abnormality.

test, the tests it did perform constituted fraud.

Judge Easterbrook, writing for a unanimous panel, held for Baxter explaining that "when a supplier · complies with the existing regulations, it is entitled to represent to the government (and to the world) that it has done so, without facing a claim of deception.... Equating "imperfect tests" with "no tests" would strain language past the breaking point." *Luckey*, 183 F.3d at 732. *Luckey* has been interpreted to stand for the proposition that an implied false certification theory can succeed only where the defendant's compliance with statutory or regulatory authority is so essential for reimbursement that, if the government had been aware of the defendant's non-compliance, it would have refused payment. *Accord United States ex rel. Mikes v. Straus*, 84 F.Supp.2d 427 (S.D.N.Y.1999). *Luckey*'s holding accords with the reasoning of other Courts of Appeals that have held claims that fail to meet the relevant standard of care are nevertheless insufficient to establish falsity under the FCA. *See Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1478 (9th Cir.1996); *see also United States ex rel. Hopper v. Anton*, 91 F.3d 1261 (9th Cir.1996); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899 (5th Cir.1997). The Court finds the reasoning of these authorities quite persuasive, and concludes plaintiff cannot demonstrate a genuine issue of material fact with respect to false claims under the FCA, even if he can demonstrate defendants' practice failed to conform to the standard of care applicable to the interpretation of venous ultrasounds.

### D.

■ Alternately, plaintiff suggests a question of fact exists as to whether the

review performed by defendant physicians received sufficient information in order to permit them to claim to have performed an interpretation of the ultrasound studies.[12] Under plaintiff's theory, defendants' claims were false because defendant physicians did not actually deliver any distinct service, having merely plagiarized the technician/technologist's worksheet. Plaintiff does not deny, however, that defendant physicians reviewed the materials—even if only to read them and regurgitate the information in a final report. Plaintiff thus argues the sufficiency of defendant's review, questioning "whether enough information is provided to Defendant physicians in order to make an 'interpretation' which is properly billable to the federal government." (Pl. Br. at 8). Hence, while plaintiff does not question whether physicians actually performed some work with regard to the venous ultrasounds, he suggests defendants practice fails to constitute an interpretation "in any *reasonable* sense or meaning of the word." (Pl. Br. at 9)

With this argument, plaintiff attempts to distinguish *Luckey* by asserting that the question of whether the failure to employ a superior test equates to the lack of a test is distinct from the issue of whether defendant physicians had enough information to have justifiably claimed to have performed an "interpretation." Taken · in the light most favorable to plaintiff, however, the dispute over whether defendants performed an "interpretation or reading" of the "results of the test" merely · highlights the ambiguity of these undefined terms in the Provider Handbook. Accordingly, plaintiff's attempt to distinguish *Luckey* devolves to a dispute over the meaning of the terms governing the delivery of the professional component of physician ser-

---

**12.** Plaintiff avers a question of fact exists as to whether the ultrasound is "binary," apparently arguing the delivery and interpretation of the ultrasound must be performed by the same provider. Plaintiff offers no support for this contention, beyond a regulation in the Carriers Manual that excludes from the definition of "physician services" any "interposition of a third person's judgment." 42 C.F.R. 1395. However, the Carriers Manual is neither governing law nor an appropriate guideline for providers, and thus cannot form the basis for a genuine issue of material fact. *See* Part III A., *infra*.

vices, rather than a factual claim as to whether defendants (at a minimum) actually performed some work by reading and/or reviewing work performed by the technician/technologists.

Such a legal dispute is, however, insufficient to establish falsity under the FCA. *See Hagood,* 81 F.3d at 1477. As expressed by the Seventh Circuit in *Luckey,* "Most companies in [the defendant's] position will have scientists who argue for additional precautions, and others who think that the existing precautions are enough (if not excessive) ... As written, the regulations do not resolve this debate. [The defendant] had to make a decision for itself." *Luckey,* 183 F.3d at 732. Accordingly, a defendant's decision in the face of a dispute over the requirements of governing regulations is insufficient, without more, to constitute falsity. Stated another way, "[a]n example of a false statement in an invoice in a similar context is the representation that a resident worked five days a week at a hospital when he worked only three." *Hindo v. University of Health Sciences,* 65 F.3d 608, 613 (7th Cir.1995). The record here falls fall short of this standard. Plaintiff does not dispute that, at a minimum, defendant physicians read and relied upon the technician/technologist worksheet to prepare the physician's report. From this information, sufficient or not, the physicians represented that they formed a medical judgment regarding the presence of a DVT in the patient, and tailored their delivery of health services accordingly.

## IV

■ Having determined that plaintiff has failed to adduce sufficient facts capable of establishing the element of falsity under the case, the Court next considers the issue of scienter. To succeed under the FCA, a relator need not demonstrate specific intent to defraud the government. *See Hagood,* 929 F.2d at 1421. The Act's scienter requirement is set forth in § 3729(b), which requires either " 'actual

knowledge' that one is submitting a false or fraudulent claim for payment or approval, acts in deliberate ignorance of the truth or falsity of one's false claim, or 'acts in reckless disregard of the truth or falsity of the claim.' " *Wang v. FMC Corp.,* 975 F.2d 1412, 1420 (9th Cir.1992).

■ Under this standard, plaintiff must adduce facts that establish more than mere innocent mistakes or negligence on the part of defendants. *See Hindo,* 65 F.3d at 613. Furthermore, "what constitutes the offense is not intent to deceive but knowing presentation of a claim that is either fraudulent or simply false. The requisite intent is the knowing presentation of what is known to be false." *Id.* Thus, the Court inquires whether the record supports an inference that defendant physicians' practice with regard to interpretation of venous ultrasound studies amounts to deliberate ignorance of, or reckless disregard for, applicable guidelines for submission of claims for venous ultrasounds with a 26 modifier.

The Court begins by first asking whether defendants proceeded in reckless disregard of applicable billing regulations. Plaintiff offers the affidavit of an independent government health insurance consultant testifying that, in his experience, physicians are familiar with HCFA regulations surrounding the delivery of ultrasound studies, and that the Carriers Manual regulations are applicable to venous ultrasounds. (Pl.Ex. 16). This testimony is insufficient to create an inference of reckless disregard on the part of defendants, however, because the reckless disregard must be of applicable regulations to the submission of claims. The first opinion expressed by the expert relates to the familiarity of physicians with billing regulations not expressly related to venous ultrasound studies, which the Court holds inapplicable to this action in the analysis of Part III A., *infra.* The second opinion offered by plaintiff's expert constitutes a legal conclusion that only the Court is competent to offer. Hence, plaintiff has

not met his burden to adduce facts creating an inference of reckless disregard.

In addition, plaintiff's showing falls short of creating an inference of deliberate ignorance. Plaintiff offers his affidavit testimony that internal discussions occurred that indicated defendant physicians' awareness that their claims rested upon uncertain ground, and that only Dr. Jain investigated what regulations actually govern the interpretation of venous ultrasounds. (Pl.Ex. 18). However, plaintiff concedes that on at least three occasions defendant Jain contacted HCFA, including a Freedom of Information Act request, seeking any "published guidelines specific to procedures 93970–93971 with a 26 modifier." (Pl.Ex. 7). The answer defendant Jain received: "[w]e have no published guidelines specific to procedures 93970–93971 with a 26 modifier," does not give rise to an inference of either deliberate indifference or reckless disregard. (Pl.Ex. 7). Rather, it reinforces the Court's conclusion that the general regulations applicable to physicians' services are the only appropriate standard with which to judge defendant physicians' billing practice. Moreover, the evidence of internal discussions plaintiff points to cuts against his argument that defendant physicians were deliberately ignorant, and instead suggests defendants evinced concern and investigated the question of what procedures were required to submit a proper claim for reimbursement.

## V

In conclusion, plaintiff's disagreement with the qualitative nature and degree of review necessary for defendant physicians to claim to "interpret" the technical component of a venous ultrasound study and then bill the government for the professional component fails to amount to either a false claim or a knowingly false claim under the FCA. Plaintiff's theory contending that claims billed to the government for interpretations of venous ultrasound studies performed by technicians consti-tute fraud because defendant physicians allegedly delivered services falling short of what plaintiff surmises is required under the appropriate standard of care is insufficient, without more, to establish falsity under the FCA. Similarly, plaintiff's position that defendant physicians lacked sufficient information to make a properly billable interpretation devolves to a legal dispute incapable of demonstrating the falsity of defendant physicians' claims as falsity has been construed by authorities persuasive to this Court. Moreover, even were plaintiff to succeed in demonstrating that defendants submitted false claims because they did not review the underlying hard copy data from the studies, the record fails to establish that defendants acted either in deliberate indifference or reckless disregard of the truth of the claims.

If in fact the HCFA regulations applicable to physician providers overcompensate them for the services they actually provide in conjunction with the professional component of venous ultrasound studies, or, as plaintiff alleges, a higher standard of patient care would result by requiring physicians to review hard copy data as a prerequisite to submitting claims for reimbursement, the appropriate remedy is either to convince the government to reduce the compensation paid for such services or to modify the regulations governing provider reimbursement, rather than filing suit under the False Claims Act. Plaintiff thus requests the Court to grant him relief that both the case law and the record indicate must be found elsewhere, if appropriate. Accordingly, summary judgment will be entered in favor of defendants.